IN THE SUPREME COURT OF NORTH CAROLINA

No. 113PA16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

AUSTIN LYNN MILLER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 783 S.E.2d 512 (2016), vacating a judgment entered on 5 February 2015 by Judge Eric C. Morgan in Superior Court, Watauga County. Heard in the Supreme Court on 14 February 2017.

*Joshua H. Stein, Attorney General, by Joseph L. Hyde, Assistant Attorney General, for the State-appellant.*

*Jeffrey William Gillette for defendant-appellee.*

ERVIN, Justice.

On 12 June 2013, the General Assembly enacted legislation that, effective 1 December 2013, made it "unlawful for any person" to "[p]ossess a pseudoephedrine product if the person has a prior conviction for the possession or manufacture of methamphetamine," with any person convicted of this offense to "be punished as a Class H felon." Act of June 12, 2013, ch. 124, secs. 1, 3, 2013 N.C. Sess. Laws 291,

291-93 (codified at N.C.G.S. § 90-95(d1)(1)(c)).[1]  Prior to the enactment of N.C.G.S. § 90-95(d1)(1)(c), any person aged eighteen or older was entitled to purchase "at retail" up to "3.6 grams of any pseudoephedrine products[2] per calendar day" and up to "9 grams of pseudoephedrine products within any 30-day period," N.C.G.S. § 90-113.53 (2015),[3] as long as the purchaser furnished appropriate photo identification and a current valid residential address and signed a form attesting to the validity of his or her personal information and other information that could be accessed by law enforcement officers, *see id.* §§ 90-113.52 (2015), -113.53.  The ultimate issue presented for our consideration in this case is whether N.C.G.S. § 90-95(d1)(1)(c), as applied to defendant, worked a deprivation of defendant's right to due process of law under the federal constitution.  After careful consideration of the record evidence in light of the applicable legal principles, we conclude that defendant's as-applied challenge to the constitutionality of N.C.G.S. § 90-95(d1)(1)(c) lacks merit and reverse the decision of the Court of Appeals, *State v. Miller*, ___ N.C. App. ___, ___, 783 S.E.2d 512, 523-24 (2016), to the contrary.

---

[1] The Governor approved the new statutory provision on 19 June 2013.

[2] A "pseudoephedrine product" is "a product containing any detectable quantity of pseudoephedrine or ephedrine base, their salts or isomers, or salts of their isomers." N.C.G.S. § 90-113.51(a) (2015).

[3] The statutory purchase limits do not apply "if the product is dispensed under a valid prescription." *Id.* § 90-113.53(a), (b).

On 3 October 2012, Judge R. Stuart Albright entered a judgment in Ashe County File Nos. 12 CrS 248, 11 CrS 50918, 11 CrS 50919, and 11 CrS 50920 sentencing defendant to a term of sixteen to twenty months of imprisonment, with this sentence being suspended and with defendant being placed on supervised probation for a period of thirty-six months, based upon defendant's convictions for possession of a methamphetamine precursor with the intent to distribute (File No. 12 CrS 248), maintaining a vehicle or dwelling for the purpose of selling or delivering a controlled substance (File No. 11 CrS 50918), possession of methamphetamine (File No. 11 CrS 50919), and possession of drug paraphernalia (File No. 11 CrS 50920). On 5 January 2014, defendant purchased "Allergy Congestion Relief D–ER tabs," which contained 3.6 grams of pseudoephedrine, from a Walmart pharmacy in Boone. On 7 January 2014, Detective John Hollar of the Watauga County Sheriff's Office examined the National Precursor Log Exchange, which is an electronic database administered by the National Association of Drug Diversion Investigators that tracks pseudoephedrine purchases, N.C.G.S. § 90-113.52A (2015), and determined that defendant had made this pseudoephedrine purchase. In view of the fact that Detective Hollar knew that defendant had previously been convicted of possessing methamphetamine, he obtained the issuance of a warrant for defendant's arrest. On 4 August 2014, the Watauga County grand jury returned a bill of indictment charging defendant with "possess[ing] an immediate precursor chemical, pseudoephedrine, having a prior conviction for the possession of methamphetamine, to wit: The

defendant was convicted of Possession of Methamphetamine in Ashe County, File Number 11 CRS 50919, on 1 October 2012."[4]

On 4 February 2015, defendant filed a motion in which he requested the trial court to declare N.C.G.S. § 90-95(d1)(1)(c) unconstitutional on the grounds that punishing him for violating this newly enacted statutory provision contravened his federal due process rights as enunciated in *Lambert v. California*, 355 U.S. 225, 2 L. Ed. 2d 228 (1957). In support of this contention, defendant argued that N.C.G.S. § 90-95(d1)(1)(c) had criminalized the otherwise innocent act of possessing a pseudoephedrine product for a subset of felons to which defendant belonged despite the fact that the purchase of such substances by individuals like defendant had been entirely lawful little more than a month earlier and that the State's failure to provide adequate notice of this change in law constituted a federal due process violation like that identified in *Lambert*. In addition, defendant asserted that federal due process principles required that a mens rea or scienter element be imported into N.C.G.S. § 90-95(d1)(1)(c) in light of *Lambert*; *Morissette v. United States*, 342 U.S. 246, 96 L. Ed. 288 (1952); and *Liparota v. United States*, 471 U.S. 419, 85 L. Ed. 2d 434 (1985). For that reason, in the event that this case proceeded to trial, defendant argued that the trial court would be required to instruct the jury that, in order to return a verdict

---

[4] Although the dates associated with defendant's conviction for methamphetamine possession set out in the indictment and delineated in the evidence differ, defendant did not argue in the Court of Appeals that this divergence between allegation and proof constituted a fatal variance entitling him to dismissal of the charge that had been lodged against him.

of guilty, the jury would have to find beyond a reasonable doubt that defendant had the specific intent to violate the law consisting of proof that defendant "had knowledge that it was illegal to purchase [a pseudoephedrine product] because he had a meth[amphetamine] conviction."

In response, the State argued that N.C.G.S. § 90-95(d1)(1)(c) resembles N.C.G.S. § 14-415.1, which provides, in pertinent part, that "[i]t shall be unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm or any weapon of mass death and destruction" and which has repeatedly been upheld by North Carolina courts. N.C.G.S. § 14-415.1(a) (2015). More specifically, the State asserted that N.C.G.S. § 90-95(d1)(1)(c), like N.C.G.S. § 14-415.1, merely requires an "intent to act"; that the dangers posed by methamphetamine are similar to those posed by firearms in the possession of felons; and that the similarities between these two statutes demonstrate the constitutionality of N.C.G.S. § 90-95(d1)(1)(c). Additionally, the State asserted that defendant's specific intent argument amounted to a claim that "ignorance of the law should be an excuse." At the conclusion of the pretrial hearing, the trial court denied defendant's motion to declare N.C.G.S. § 90-95(d1)(1)(c) unconstitutional "without prejudice to later arguments at the charging conference as to jury instructions."

At the jury instruction conference held near the conclusion of defendant's trial, defendant reiterated his request that the trial court instruct the jury concerning the necessity for a showing that he had acted with specific intent to violate the law using the "instruction from the *Liparota* case which tracked an earlier federal pattern jury instruction." Ultimately, the State and defendant agreed that the trial court would instruct the jury utilizing N.C.P.I. Crim. 120.10, which defines intent, 1 N.C.P.I.–Crim. 120.10 (June 2012), and N.C.P.I. Crim. 261.55, which defines the showing that the State was required to make in order to convict defendant of the substantive offense with which he had been charged, 3 N.C.P.I.–Crim. 261.55 (June 2014). In light of that agreement, the trial court instructed the jury that:

> Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom.
>
> The defendant has been charged with the possession of a pseudoephedrine product with a prior conviction of the possession of methamphetamine. For you to find the defendant guilty of this offense, the State must prove two things beyond a reasonable doubt: First, that the defendant possessed a pseudoephedrine product. And, second, that the defendant has a prior conviction for the possession of methamphetamine.
>
> If you find from the evidence beyond a reasonable doubt that the defendant possessed a pseudoephedrine product and has a prior conviction for the possession of methamphetamine, then it would be your duty to return a verdict of guilty. If you do not so find, or have a reasonable

> doubt as to one or more of these things, then it would be
> your duty to return a verdict of not guilty.

At the conclusion of its deliberations, the jury returned a verdict convicting defendant as charged. Based upon the jury's verdict, the trial court entered a judgment sentencing defendant to a term of six to seventeen months of imprisonment, with this sentence having been suspended and with defendant having been placed on supervised probation for a period of twenty-four months. Defendant successfully sought review of the trial court's judgment by filing a petition seeking the issuance of a writ of certiorari with the Court of Appeals. *Miller*, ___ N.C. App. at ___, 783 S.E.2d at 516.

In seeking relief from the trial court's judgment before the Court of Appeals, defendant argued that N.C.G.S. § 90-95(d1)(1)(c), as applied to him, violated his due process rights. In support of this contention, defendant argued that, in instances, like this one, in which a state has rendered otherwise innocent and lawful behavior subject to significant criminal penalties, due process considerations require either that scienter or mens rea be shown in order to prove guilt or, in the alternative, that the State establish that defendant had fair warning that a previously lawful act was now subject to the criminal sanction. Defendant claimed that he reasonably believed that he had the right to lawfully purchase pseudoephedrine products on 5 January 2014, that he reasonably lacked any knowledge that the law had changed effective 1 December 2013, that he did not intend to violate the law by purchasing an allergy

medication, and that punishing him as a felon for purchasing a product containing pseudoephedrine under such circumstances was fundamentally unfair. For that reason, defendant asserted that guilt of the offense made punishable by N.C.G.S. § 90-95(d1)(1)(c) should require proof that defendant knew that his actions were unlawful or, in the absence of such a scienter or mens rea requirement, that the State's failure to notify him and other similarly situated individuals that they were prohibited from purchasing products containing pseudoephedrine as a precondition for subjecting them to the criminal sanction for acting in that manner rendered the relevant statutory provision unconstitutional.

In response, the State argued that, since N.C.G.S. § 90-95(d1)(1)(c) does not fall within the narrow category of crimes for which knowledge that the prohibited conduct is unlawful is required, defendant's ignorance of the prohibited nature of his conduct does not preclude a finding of criminal liability. In the State's view, N.C.G.S. § 90-95(d1)(1)(c) is a straightforward and easily understood statutory provision rather than a "highly technical" tax or currency statute of the sort that requires proof that the defendant knew that his or her conduct was unlawful, citing *Bryan v. United States*, 524 U.S. 184, 194-95, 141 L. Ed. 2d 197, 207 (1998). Moreover, the State argued that the exception to the general rule that proof that the defendant knew of the unlawfulness of his or her conduct is not required in order to establish the defendant's guilt set out in *Lambert* only applies in the event that the challenged statutory provision criminalizes "wholly passive" conduct and that defendant's

decision to purchase pseudoephedrine cannot be characterized in that manner. Although proof of defendant's guilt in this case does require a showing that defendant knew that he had a prior methamphetamine possession conviction and that the substance that he possessed contained pseudoephedrine, the relevant statutory provision cannot be reasonably construed to require proof that defendant knew that it was unlawful for him to possess pseudoephedrine as a precondition for a finding of guilt.

The Court of Appeals began its discussion of defendant's challenges to the trial court's judgment by noting that the extent, if any, to which the General Assembly intended to include a specific intent or scienter element in N.C.G.S. § 90-95(d1)(1)(c) depends upon the manner in which the relevant statutory language should be construed.[5] *Miller*, ___ N.C. App. at ___, 783 S.E.2d at 516. Given that N.C.G.S. § 90-95(d1)(1)(c) fails to explicitly provide for a specific intent or mens rea element and that the General Assembly has included such language in defining the other offenses listed under N.C.G.S. § 90-95(d1), *id.* at ___, 783 S.E.2d at 516-17 (discussing N.C.G.S. §§ 90-95(d1)(1)(a)-(b) and 90-95(d1)(2)(a)-(b)), the Court of Appeals

---

[5] The exact nature of defendant's statutory construction challenge to the trial court's judgment is not entirely clear. Although defendant could have advanced this contention in support of an argument that the trial court had erred by failing to dismiss the charge that had been lodged against him for insufficiency of the evidence, an argument that the trial court had erroneously instructed the jury concerning the applicable law, or an argument that N.C.G.S. § 90-95(d1)(1)(c) could only be upheld against a constitutional challenge in the event that the relevant statutory provision was construed so as to include such a scienter or mens rea requirement, defendant did not clearly make any one of these three arguments.

concluded that the General Assembly had " ' intentionally and purposely' " excluded "an intent element" from N.C.G.S. § 90-95(d1)(1)(c), *id.* at ___, 783 S.E.2d at 517 (quoting *State v. Watterson*, 198 N.C. App. 500, 506, 679 S.E.2d 897, 900 (2009) (quoting *N.C. Dep't of Revenue v. Hudson*, 196 N.C. App. 765, 768, 675 S.E.2d 709, 711 (2009))). Although "any possession of a controlled substance offense contains an implied *knowledge* element, to wit, that the defendant must know he possesses the controlled substance and must also know the identity of the substance," *id.* at ___ n.3, 783 S.E.2d at 517 n.3 (citing *State v. Galaviz–Torres*, 368 N.C. 44, 52, 772 S.E.2d 434, 439 (2015) (discussing *State v. Coleman*, 227 N.C. App. 354, 742 S.E.2d 346, *disc. rev. denied*, 367 N.C. 271, 752 S.E.2d 466 (2013))), the Court of Appeals concluded that the General Assembly intended for N.C.G.S. § 90-95(d1)(1)(c) "to be exactly what its plain language indicates: a strict liability offense without any element of intent," *id.* at ___, 783 S.E.2d at 517.

After rejecting defendant's contention that N.C.G.S. § 90-95(d1)(1)(c) should be construed to require proof that defendant knew that he was not entitled to purchase products containing pseudoephedrine, the Court of Appeals addressed defendant's as-applied challenge to the constitutionality of that statutory provision. *Id.* at ___, 783 S.E.2d at 517-23. Despite its recognition "that methamphetamine manufacture and use is a significant law enforcement and public health problem which demands serious criminal penalties," *id.* at ___, 783 S.E.2d at 519-20, the Court of Appeals concluded that, "in light of . . . *Lambert* and *Liparota*," N.C.G.S. § 90-95(d1)(1)(c) "is

unconstitutional as applied to [defendant]," *id.* at ___, 783 S.E.2d at 520, given that "[p]ossession of pseudoephedrine products is an innocuous and entirely legal act for the majority of people in our State, including most convicted felons," *id.* at ___, 783 S.E.2d at 520, and that "possessing allergy medications containing pseudoephedrine," unlike the possession of "illegal drugs," "hand grenades," or "dangerous acids," "is an act that citizens, including convicted felons, would reasonably assume to be legal," *id.* at ___, 783 S.E.2d at 520 (citing *Liparota*, 471 U.S. at 426, 85 L. Ed. 2d at 440). Prior to the enactment of N.C.G.S. § 90-95(d1)(1)(c), the statutory provisions regulating the purchase of products containing pseudoephedrine required the provision of notice of the lawfulness of particular purchases at the point of sale, *id.* at ___, 783 S.E.2d at 520; however, violations of N.C.G.S. § 90-95(d1)(1)(c) can occur without the provision of any such point of sale notice even though such purchases would be lawful "for most people, *including the vast majority of convicted felons*," *id.* at ___, 783 S.E.2d at 520. "Simply put," the Court of Appeals reasoned, "there were no 'circumstances which might move one to inquire as to' a significant change in the [Controlled Substances Act's] requirements nor any notice to [defendant] that the new [provision] had transformed an innocent act previously legal for him into a felony." *Id.* at ___, 783 S.E.2d at 520 (quoting *Lambert*, 355 U.S. at 229, 2 L. Ed. 2d at 232). In reaching this conclusion, the Court of Appeals found the decision in *Wolf v. State of Oklahoma*, 2012 OK CR 16, 292 P.3d 512 (Okla. Crim. App. 2012), *cert. denied*, ___ U.S. ___, 186

L. Ed. 2d 877 (2013), to be highly persuasive, *Miller*, ___ N.C. App. at ___, 783 S.E.2d

at 520-21, concluding, in reliance upon *Wolf*, that

> [t]aken together, *Lambert* and *Liparota* suggest
> that, while a legislature may criminalize conduct in itself,
> with no intent requirement, the legislature must make
> some provision to inform a person that the conduct, as
> applied to her, is criminal. This is particularly important
> where the conduct in question is otherwise legal. This is
> precisely the circumstance here: some convicted felons are
> prohibited from purchasing pseudoephedrine, while others,
> along with the general population, are not.

*Id.* at ___, 783 S.E.2d at 521 (alteration in original) (quoting *Wolf*, 2012 OK CR at

¶ 10, 292 P.3d at 516). As a result, the Court of Appeals held that N.C.G.S. § 90-

95(d1)(1)(c) is unconstitutional "as applied to a defendant in the absence of notice to

the subset of convicted felons whose otherwise lawful conduct is criminalized thereby

or proof beyond a reasonable doubt by the State that a particular defendant was

aware that his possession of a pseudoephedrine product was prohibited by law," *id.*

at ___, 783 S.E.2d at 521, and that defendant's conviction for violating N.C.G.S. §

95-90(d1)(1)(c) should, for that reason, be vacated, *id.* at ___, 783 S.E.2d at 523-24.

On 9 June 2016, we allowed the State's petition for discretionary review of the Court

of Appeals' decision that N.C.G.S. § 90-95(d1)(1)(c) is unconstitutional as applied to

defendant on notice-related grounds.

In seeking relief from the decision of the court below before this Court, the

State argues that the Court of Appeals disregarded the well-established legal

principle that ignorance of the law is no excuse by misapplying the *Lambert* exception

and misconstruing decisions such as *Liparota* in order to limit the otherwise applicable maxim that members of the public have notice of the applicable law to situations in which a reasonable person would know the content of the law. In the State's view, this case is controlled by *Lambert* and this Court's decision in *State v. Bryant*, 359 N.C. 554, 614 S.E.2d 479 (2005), in which we described *Lambert* as creating "a narrow exception to the general rule" to the effect that citizens are presumed to know the law applicable in situations when the allegedly unlawful conduct is " 'wholly passive.' " *Id.* at 566, 614 S.E.2d at 487 (quoting *Lambert*, 355 U.S. at 228, 2 L. Ed. 2d at 231). In order to take advantage of this exception, the defendant must establish that the statutory provision in question criminalizes a failure to act, such as the failure to register as a felon at issue in *Lambert* and the failure to register as a sex offender at issue in *Bryant*. In the State's view, defendant was not prosecuted for a failure to act. On the contrary, N.C.G.S. § 90-95(d1)(1)(c) proscribes an affirmative act, which is the intentional possession of a prohibited substance. As defendant conceded before the trial court, his conduct was "not an absence to act like there is in *Lambert*." In the event that a defendant fails to establish that his behavior is "wholly passive," whether because the relevant conduct does not involve a failure to act, as is the situation in this case, or because the defendant's failure to act occurred under circumstances that would lead a reasonable person to inquire as to his or her legal duties, as was the case with the defendant's duty to register as a sex offender in North Carolina at issue in *Bryant*, the maxim

-13-

that ignorance of the law provides no excuse and that all citizens are presumed to know the law remains applicable. Instead of correctly applying the narrow *Lambert* exception in accordance with this Court's decision in *Bryant*, the Court of Appeals created an inappropriate notice requirement resting upon a failure to distinguish between an affirmative action and purely passive conduct and conflating the analysis set out in *Lambert* with the analysis utilized in statutory construction cases such as *Liparota*.

In response, defendant contends that the proper resolution of the critical question concerning whether an act is "wholly passive" for purposes of *Lambert* and *Bryant* hinges upon whether the surrounding circumstances would put a reasonable person on notice that he or she should have inquired as to whether there had been a change in law rather than upon whether the underlying conduct should be deemed active or passive. Defendant argues that *Lambert* and *Bryant* rest upon a distinction between "active and passive *notice*, that is, the presence or absence of 'circumstances that should alert the doer to the consequences of his deed,' " rather than upon a distinction between acts of commission and acts of omission. According to defendant, his conduct should be deemed "wholly passive" given the absence of "circumstances that would [have] move[d] him to inquire if the General Assembly had recently criminalized his otherwise innocuous conduct." Moreover, even if a defendant's underlying conduct is a component of the relevant constitutional analysis, possession, as compared to the purchase, of a substance is a passive act.

In the alternative, defendant contends that, even if we "decline[ ] to adopt the analysis of the Court of Appeals," we should still affirm the result that it reached on the grounds "that an element of scienter must be read into [N.C.G.S.] § 90-95(d1)(1)(c) to comport with traditional notions of fair play and substantial justice, and the State failed to present evidence from which a jury could infer such an element." According to defendant, the Court of Appeals should have held that proof of defendant's "awareness that a reasonable person in his shoes would have[ known] that the purchase of pseudoephedrine was an illegal act" constituted an essential element of the offense created by N.C.G.S. § 90-95(d1)(1)(c). In reaching a contrary conclusion, the Court of Appeals overlooked the fact that the United States Supreme Court has read a similar requirement into various criminal statutes for the purpose of ensuring the constitutionality of the challenged statute regardless of any evidence concerning actual Congressional intent.

As this Court indicated in *Bryant*, the *Lambert* exception to the general rule that ignorance of the law is no excuse is "decidedly narrow." 359 N.C. at 568, 614 S.E.2d at 488.[6] After carefully reviewing the record, we conclude that the *Lambert* exception does not operate to protect defendant from criminal liability given the facts

---

[6] Moreover, as the United States Supreme Court has stated, "application [of *Lambert*] has been limited, lending some credence to Justice Frankfurter's colorful prediction in dissent that the case would stand as 'an isolated deviation from the strong current of precedents—a derelict on the waters of the law.' " *Texaco, Inc. v. Short*, 454 U.S. 516, 537 n.33, 70 L. Ed. 2d 738, 756 n.33 (1982) (quoting *Lambert*, 355 U.S. at 232, 2 L. Ed. 2d at 233 (Frankfurter, J., dissenting)).

contained in the present record. Moreover, defendant's alternative argument to the effect that guilt of the offense defined in N.C.G.S. § 90-95(d1)(1)(c) requires proof that the defendant knew of the illegality of his conduct is not properly before us. Thus, we reverse the decision of the Court of Appeals.

> The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system. Based on the notion that the law is definite and knowable, the common law presumed that every person knew the law. This common-law rule has been applied by the Court in numerous cases construing criminal statutes.

*Bryant*, 359 N.C. at 566, 614 S.E.2d at 487 (citations omitted) (quoting *Cheek v. United States*, 498 U.S. 192, 199, 112 L. Ed. 2d 617, 628 (1991)). In *Lambert*, the United States Supreme Court sustained an as-applied challenge to a municipal ordinance making it unlawful for any individual who had been convicted of an offense that was a California felony or would have been a felony if committed in California to remain in Los Angeles for more than five days without registering with the Chief of Police. *Lambert*, 355 U.S. at 226-27, 2 L. Ed. 2d at 230-31. After noting that the defendant, unlike defendant in this case, had presented proof that she "had no actual knowledge of the [registration] requirement" and that the relevant ordinance did not require proof of "willfulness," *id.* at 227, 2 L. Ed. 2d at 231, the United States Supreme Court stated that the relevant issue before it was "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made

of the probability of such knowledge," *id.* at 227, 2 L. Ed. 2d at 231. Recognizing that, as a general proposition, lawmakers have wide latitude in defining the scope and extent of prohibited conduct, the Court pointed out that the defendant's "conduct [was] wholly passive—mere failure to register" and did not constitute "the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.* at 228, 2 L. Ed. 2d at 231 (citations omitted). Although the Court acknowledged the rule that "ignorance of the law will not excuse," *id.* at 228, 2 L. Ed. 2d at 231 (quoting *Shevlin–Carpenter Co. v. Minnesota*, 218 U.S. 57, 68, 54 L. Ed. 930, 935 (1910)), and that the police power is "one of the least limitable" powers of government, *id.* at 228, 2 L. Ed. 2d at 231 (quoting *District of Columbia v. Brooke*, 214 U.S. 138, 149, 53 L. Ed. 941, 945 (1909)), the Court pointed out that due process conditions the exercise of governmental authority upon the existence of proper notice "where a person, wholly passive and unaware of any criminal wrongdoing, is brought to the bar of justice for condemnation in a criminal case," *id.* at 228, 2 L. Ed. 2d at 231. In view of the fact that the ordinance at issue in *Lambert* did not condition a finding of guilt upon "any activity" whatsoever, *id.* at 229, 2 L. Ed. 2d at 232, and the fact that there were no surrounding "circumstances which might move one to inquire as to the necessity of registration," *id.* at 229, 2 L. Ed. 2d at 232, "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply [were]

necessary before a conviction under the ordinance [could] stand" consistently with due process guarantees, *id.* at 229, 2 L. Ed. 2d at 232.

The statutory provision at issue in *Bryant* required individuals convicted of certain sexual offenses in other states to register as a sex offender with the relevant North Carolina sheriff's office within ten days after establishing residence in North Carolina or within fifteen days after the individual in question had entered North Carolina, whichever came first, with any person failing to comply with these requirements to be subject to criminal penalties. 359 N.C. at 561-63, 614 S.E.2d at 483-85. In that case, a person who had been convicted of committing an offense requiring registration in South Carolina and had been charged with violating the statutory provision in question challenged the provision's constitutionality as applied to him given the absence of any requirement that the State "prove actual or probable notice of his duty to register to satisfy the due process notice requirement of *Lambert*." *Id.* at 565, 614 S.E.2d at 486. In rejecting the defendant's argument, this Court stated that

> to be entitled to relief under the decidedly narrow *Lambert* exception, a defendant must establish that his conduct was "wholly passive" such that "*circumstances which might move one to inquire as to the necessity of registration are completely lacking*" and that [the] defendant was ignorant of his duty to register and there was no reasonable probability that [the] defendant knew his conduct was illegal.

*Id.* at 568, 614 S.E.2d at 488 (quoting *Lambert*, 355 U.S. at 228-29, 2 L. Ed. 2d at 231-32 (emphasis added)). Defendant's assertion to the contrary notwithstanding, this Court never indicated in *Bryant* that the distinction between active and passive conduct set out in *Lambert* revolves around the nature and extent of the notice with which the defendant had been provided rather than upon the nature and extent of the underlying conduct that led to the imposition of the criminal sanction. Instead, this Court simply assumed that the defendant's conduct amounted to a failure to act and proceeded to examine the extent to which his failure to comply with North Carolina's sex offender registration requirements had occurred under circumstances suggesting that he should have registered upon moving from South Carolina to North Carolina. *Id.* at 566-68, 614 S.E.2d at 486-88. After making no suggestion that the defendant had actual notice of the necessity that he register as a sex offender in North Carolina after moving to this state and after concluding that the defendant's case was "rich with circumstances that would move the reasonable individual to inquire of his duty to register in North Carolina such that [the] defendant's conduct was not wholly passive and *Lambert* [was] not controlling," *id.* at 568, 614 S.E.2d at 488, this Court held that the defendant's case did "not fall within the narrow *Lambert* exception to the general rule that ignorance of the law is no excuse," *id.* at 569, 614 S.E.2d at 488.

> Thus, because "[g]enerally[,] a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply," *Texaco, [Inc. v. Short,]* 454 U.S. [516,] 532, 70 L. Ed. 2d [738,] 752[ (1982), this Court

-19-

> remained] bound by the rule that "[a]ll citizens are presumptively charged with knowledge of the law." *Atkins v. Parker*, 472 U.S. 115, 130, 86 L. Ed. 2d 81, 93 (1985); *see also N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283, 69 L. Ed. 953, 957 (1925) ("All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them.").

*Id.* at 569, 614 S.E.2d at 488-89 (first and seventh alterations in original). As a result, *Bryant* establishes that, in the event that a defendant's conduct is not "wholly passive," because it arises from either the commission of an act or a failure to act under circumstances that reasonably should alert the defendant to the likelihood that inaction would subject him or her to criminal liability, *Lambert* simply does not apply.

A defendant commits the offense delineated in N.C.G.S. § 90-95(d1)(1)(c) in the event that he or she has "the power and intent to control [the] disposition or use" of the substance that the defendant is charged with possessing, *State v. Harvey*, 281 N.C. 1, 12, 187 S.E.2d 706, 714 (1972), with knowledge of the identity of the substance that the defendant is alleged to have possessed, *Galaviz–Torres*, 368 N.C. at 49, 772 S.E.2d at 437 (citation omitted). The undisputed evidence contained in the present record tends to show that defendant actively procured the pseudoephedrine product that he was convicted of possessing over a month after it had become unlawful for him to do so and almost six months after the enactment of N.C.G.S. § 90-95(d1)(1)(c). Moreover, defendant has not argued in either this Court or the lower courts that he was ignorant of the fact that he possessed a pseudoephedrine product or that he had previously been convicted of methamphetamine possession. As defendant himself

acknowledged, his conduct differs from the failure to register at issue in *Lambert* and *Bryant*. Since defendant's conviction rests upon his own active conduct rather than a "wholly passive" failure to act, there is no need for us to determine whether the surrounding circumstances should have put defendant on notice that he needed to make inquiry into his ability to lawfully purchase products containing pseudoephedrine. As a result, defendant's as-applied challenge to the constitutionality of N.C.G.S. § 90-95(d1)(1)(c) necessarily fails.

*Liparota* and other similar decisions, whether considered in conjunction with or in addition to *Lambert*, do not call for a different result. In *Liparota*, the United States Supreme Court considered what "mental state, if any, that the Government" needed to show, 471 U.S. at 423, 85 L. Ed. 2d at 438, in order to establish that the defendant had violated a federal statute making it a crime to "knowingly" use, transfer, acquire, alter, or possess food stamps " 'in any manner not authorized by [the statute] or the regulations,' " *id.* at 423, 85 L. Ed. 2d at 438 (alteration in original) (quoting 7 U.S.C. § 2024(b)(1) (1977)), with the specific issue before the Court in that case being whether the term "knowingly" should be construed so as to require the Government to prove that the defendant was aware that he was acting in a manner not authorized by the applicable law, *id.* at 420-21, 85 L. Ed. 2d at 437. As a result, *Liparota*, like a number of the other decisions upon which defendant relies,[7] is a

---

[7] For example, *see Elonis v. United States*, ___ U.S. ___, ___, ___, 192 L. Ed. 2d 1, 8, 17 (2015) (interpreting a federal statute making "it a crime to transmit in interstate commerce

statutory construction case rather than one, like *Lambert*, in which the constitutionality of a statute was at issue. While these cases are arguably pertinent to defendant's statutory construction argument, they have no bearing on the constitutionality of N.C.G.S. § 90-95(d1)(1)(c) in the face of defendant's *Lambert*-based challenge. However, since neither defendant nor the State sought review of the Court of Appeals' determination that the offense defined in N.C.G.S. § 90-95(d1)(1)(c) does not include any sort of scienter or specific intent requirement over and above the knowledge requirement necessary for guilt of any possession-based offense by either noting an appeal or filing a discretionary review petition, defendant's statutory construction argument is not properly before us. *See* N.C. R. App. P. 16(a) (stating that "[r]eview by the Supreme Court after a determination by the Court of Appeals, whether by appeal of right or by discretionary review, is to determine whether there is error of law in the decision of the Court of Appeals" and that, "[e]xcept when the appeal is based solely upon the existence of a dissent in the

'any communication containing any threat . . . to injure the person of another' " as requiring proof that the defendant intended to issue threats or knew that his communications would be viewed as threats (ellipsis in original) (quoting 18 U.S.C. § 875(c) 1994))); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68, 78, 130 L. Ed. 2d 372, 378, 385 (1994) (interpreting a federal statute prohibiting persons from "knowingly" transporting, shipping, receiving, distributing, or reproducing a visual depiction, if such depiction " 'involves the use of a minor engaging in sexually explicit conduct,' " to require proof that the defendant knew of the sexually explicit nature of the material and the age of the individuals depicted in the video (quoting 18 U.S.C. § 2252(a)(1)(A), -(a)(2)(A) (1988 ed. and Supp. V))); *Morissette*, 342 U.S. at 248, 271, 96 L. Ed. at 292, 304 (interpreting a federal statute providing that " 'whoever embezzles, steals, purloins, or knowingly converts' " property of the federal government shall be fined and imprisoned to require that the defendant have "knowledge of the facts, though not necessarily the law, that made the taking a conversion" (quoting 18 U.S.C. § 641 (1948))).

Court of Appeals, review in the Supreme Court is limited to consideration of the issues stated in the notice of appeal filed pursuant to Rule 14(b)(2) or the petition for discretionary review and the response thereto filed pursuant to Rule 15(c) and (d), unless further limited by the Supreme Court, and properly presented in the new briefs required by Rules 14(d)(1) and 15(g)(2) to be filed in the Supreme Court"); *see also Estate of Fennell v. Stephenson*, 354 N.C. 327, 331-32, 554 S.E.2d 629, 632 (2001) (stating that "this Court's review of the Court of Appeals decision is limited to the issues raised by [the] defendants' petition for discretionary review" because the plaintiffs had failed to file their own discretionary review petition or a conditional discretionary review petition). As a result, given that defendant has failed to establish that his conduct in possessing pseudoephedrine was "wholly passive," *Bryant*, 359 N.C. at 568, 614 S.E.2d at 488, we hold that defendant's conviction for violating N.C.G.S. § 95-90(d1)(1)(c) did not result in a violation of his federal constitutional right to due process of law and, accordingly, reverse the decision of the Court of Appeals.

REVERSED.

Justice MORGAN dissenting

While I agree with my learned colleagues in the majority that the Court of Appeals' interpretation of the applicability of *Liparota v. United States*, 471 U.S. 419,

105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985) is misplaced, nonetheless I embrace the lower court's view that the narrow exception to the time-honored adage "ignorance of the law will not excuse" as articulated in *Lambert v. California*, 355 U.S. 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957) is applicable in the instant case regarding the properness of notice and due process. In addition, I consider the majority's interpretation of the phrase "wholly passive" as originally coined in *Lambert* and applied by this Court in *State v. Bryant*, 359 N.C. 554, 614 S.E.2d 479 (2004), *superseded by statute*, 2006 N.C. Sess. Laws, Ch. 247, *on other grounds as recognized in State v. Moore*, 240 N.C. App. 465, 478, 770 S.E.2d 131, 141, *disc. review denied*, 368 N.C. 353, 776 S.E.2d 854 (2015) to be rigidly restrictive, particularly in light of this Court's own construction of this phrase in *Bryant*, and therefore I dissent.

In *Lambert*, a criminal defendant was found guilty of violating a registration provision of Los Angeles, California's Municipal Code because, as a person who had been "convicted of an offense punishable as a felony in the State of California," she "remain[ed] in Los Angeles for a period of more than five days without registering" with the city's Chief of Police. *Lambert*, 355 U.S. at 226, 78 S. Ct. at 241-42, 2 L. Ed. 2d at 230. As a resident of Los Angeles for over seven years at the time of her arrest on suspicion of another offense, the defendant argued that her due process rights under the United States Constitution were violated with regard to the application of the city's registration law to her, because she had no actual knowledge of the requirement to register pursuant to the Los Angeles Municipal Code. *Id.* at 226, 78

S. Ct. at 241-42, 2 L. Ed. 2d at 230-31. In framing the legal issue in this case as a question of "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge," the nation's highest court held that the Code's registration provision as applied to the defendant violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 227, 229-30, 78 S. Ct. at 242-44, 2 L. Ed. 2d at 231-32.

Defendant in the case *sub judice* cited the *Lambert* case as persuasive authority to support his position addressed by this dissent that his federal due process rights were violated by the application of the statute at issue to him because of his lack of proper notice of then newly-enacted N.C.G.S. § 90-95(d1)(1)(c), which had taken effect barely a month before defendant's proscribed pseudoephedrine purchase. Pursuant to the statute, his possession of such a substance was illegal in light of his prior methamphetamine convictions. Regarding the application of constitutional due process principles to the operation of statutes that create an imposition upon individuals convicted of a certain class of offenses that does not exist for the general population, I find the defendant in *Lambert* and the current defendant to be similarly situated. In *Lambert*, the defendant was required by law to register as a convicted felon if her stay in the city exceeded five days, which was not a registration requirement imposed on others; here, defendant was required by law to

refrain from possessing pseudoephedrine as a person convicted of methamphetamine offenses, which was not a possession restriction imposed on others.

I also find that the defendant in the case at bar is similarly situated to the *Lambert* defendant in the resolution of the legal issue in *Lambert* which was ideally identified by the United States Supreme Court. The high court found, in applying its due process analysis to the dual components of the framed issue in *Lambert*, that the Los Angeles Municipal Code registration provision violated that defendant's due process rights because she had no knowledge of the duty to register and there was no showing made by the prosecution as to the probability of such knowledge by the defendant. *Id.* at 227-28, 78 S. Ct. at 242-43, 2 L. Ed. 2d at 231. While citing the phrase "ignorance of the law will not excuse," the United States Supreme Court conversely recognized that the exercise of this legal axiom is limited by due process considerations. *Id.* at 228, 78 S. Ct. at 243, 2 L. Ed. 2d at 231. The Court went on to explain:

> Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a forfeiture might be suffered for mere failure to act. Recent cases illustrat[e] th[is] point . . . . These cases involved only property interests in civil litigation. But the principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case.

*Id.* (citations omitted).

*MORGAN, J., dissenting*

I find these observations to be pertinent and applicable to the present case, just as the United States Supreme Court articulated them as insightful direction in *Lambert*. While ignorance of the law typically will not excuse one from criminal culpability, the operation of this routine legal paradigm must take a proverbial backseat when one's constitutional due process rights, undergirded by the concept of notice, are otherwise sacrificed. In the instant case, as in *Lambert*, the defendant has claimed that he had no knowledge of the law at issue when he purchased pseudoephedrine on 5 January 2014 and was therefore in *unlawful* possession of the medication which otherwise would have been in his *lawful* possession if the purchase had been made prior to the 1 December 2013 change in the law which did not apply to the general population, nor even all convicted felons, but rather only to a particular subset of convicted felons. Also in the present case, like *Lambert*, there has been no showing made of the probability that defendant knew of this change in the law which rendered *illegal* for him such activity that was *legal* for him a mere 36 days prior to his arrest. The majority's fervent embrace of the maxim that ignorance of the law provides no excuse supplies an untenable compromise of defendant's due process rights. Indeed, the well-established existence of a law and one's ignorance of it is markedly different from the newly-created existence of a law and one's unawareness of it, especially when it is a change in the law to make what was recently lawful suddenly unlawful *and* when it does not apply to everyone.

*MORGAN, J., dissenting*

In my opinion, just as the majority fails to employ an appropriate application of the *Lambert* principle regarding due process wherein ignorance of the law by a criminal defendant is indisputable, the majority's unfortunate position is exacerbated by its strained literal interpretation of the phrase "wholly passive" in *Lambert*. The United States Supreme Court christened the term in *Lambert* to describe the lack of affirmative conduct by the defendant in that case—the failure to register one's presence—and to fit it into the framework of an individual's right to due process through the requirement of notice. The majority has focused so intently upon the "wholly passive" description of the *Lambert* defendant's proscribed conduct of failure to register that it is unable to clearly view the fullness of the relationship between due process and the required notice concerning the violation of criminal law.

The majority's position is faulty regarding its literal application of the phrase "wholly passive" on two fronts. Firstly, the United States Supreme Court in *Lambert* used the defendant's "wholly passive" failure to register as an example of the broad need to correctly balance constitutional due process with the "ignorance of the law will not excuse" axiom. The Court, in its discussion of the concept of due process through the requirement of notice in *Lambert*, spoke in sweeping terms about the importance of these legal tenets, without mentioning whether or not the illegal conduct involved was an offense of commission of an act or an offense of an omission to act. The high court thereupon applied its global look at these principles to the defendant's circumstances in *Lambert*, described her Municipal Code violation of

failure to register as behavior which was "wholly passive," continued its analysis that this failure to register abrogated the breadth and depth of the integration of due process and notice, and ultimately determined that the application of the challenged registration law to the defendant's "wholly passive" failure to register was unconstitutional. In the case *sub judice*, the majority's occupation by the "wholly passive" categorization of the *Lambert* defendant's criminal act of omission has prevented it from fully grasping the wider requirement to apply constitutional due process and notice requirements so as to protect defendant's identical rights in the current case.

Secondly, this Court utilized the "wholly passive" language in *Lambert* to both discuss and decide our decision in *Bryant*. The majority in the instant case heavily relies upon *Bryant*, a criminal action in which a defendant, who was a convicted sex offender in the state of South Carolina, was notified by the South Carolina Department of Corrections prison officials of his lifelong requirement to register with that state due to his sex offender status. *Id.* at 556, 614 S.E.2d at 480. Although the defendant was notified of this duty in verbal and written form, he failed to "provide written notice to the county sheriff where s/he was last registered in South Carolina within 10 days of the change of address to a new state," when the defendant moved out of the state of South Carolina and relocated in North Carolina. *Id.* at 556-57, 614 S.E.2d at 481 (emphasis omitted). The defendant likewise was deficient in his compliance with his South Carolina sex offender requirement that he "must send

written notice of change of address to the county Sheriff's Office in the new county and the county where s/he previously resided within 10 days of moving to a new residence." *Id.* (emphasis omitted). Although the defendant moved to Winston-Salem, North Carolina and thereby established a residence in Forsyth County, nonetheless he failed to register upon establishing residency in North Carolina and did not notify the appropriate authorities in South Carolina of his out-of-state move. *Id.* at 557-58, 614 S.E.2d at 481-82. The defendant was convicted in this state of failing to register as a sex offender and attaining the status of habitual felon. *Id.* at 558, 614 S.E.2d at 482. On appeal, the defendant argued that North Carolina's sex offender registration statute was unconstitutional as applied to an out-of-state offender who lacked notice of his duty to register upon moving to North Carolina. *Id.* at 558, 614 S.E.2d at 482. The defendant relied almost exclusively upon *Lambert* in arguing his position on appeal to this Court. *Id.* at 564, 614 S.E.2d at 485. We found in *Bryant* that the defendant was not entitled to the application of *Lambert*. *Id.* at 568-69, 614 S.E.2d at 487-88. In this Court's decision, we explained:

> We find this case rich with circumstances that would move the reasonable individual to inquire of his duty to register in North Carolina such that defendant's conduct was not wholly passive and *Lambert* is not controlling. First, defendant had actual notice of his *lifelong duty* to register with the State of South Carolina as a convicted sex offender. Second, defendant had actual notice that he must register as a convicted sex offender in South Carolina for "similar offenses from other jurisdictions" and had a duty to inform South Carolina officials of a move out of state "within 10 days of the change of address to a new state," which defendant failed to do. Third, defendant himself

informed law enforcement authorities that he had been convicted of a sex offense in Florida. These circumstances coupled with the pervasiveness of sex offender registration programs certainly constitute circumstances which would lead the reasonable individual to inquire of a duty to register in *any* state upon relocation.

*Id.* at 568, 614 S.E.2d at 488 (citations omitted) (emphasis in original). This explanation extracts pivotal terminology from the instructional language employed by the nation's Supreme Court in *Lambert* when it established the mandatory standard, which we expressly cited in *Bryant*, which I find to be the guiding rationale for adaptation in the present case and which I determine that the defendant has satisfied:

> Therefore, to be entitled to relief under the decidedly narrow *Lambert* exception, a defendant must establish that his conduct was "wholly passive" such that "*circumstances which might move one to inquire as to the necessity of registration are completely lacking*" and that defendant was ignorant of his duty to register and there was no reasonable probability that defendant knew his conduct was illegal. *Lambert*, 355 U.S. at 228-29, 78 S. Ct. 243-44, 2 L. Ed. 2d at 231-32) (emphasis added).

*Id.* at 568, 614 S.E.2d at 488. This Court's additional emphasis indicates that it defined the crucial phrase "wholly passive" as turning on whether the attendant circumstances could reasonably be seen as providing notice.

With the majority's determination that *Bryant* is controlling authority in the case at bar, it compounds the problematic analysis that it originally employs in the majority's erroneous premise that the requirement of a "wholly passive" act automatically disqualifies the current defendant from constitutional due process and

intrinsic notice requirements where ignorance of the law is an existing circumstance. This compounded misdirection is further accentuated by the recitation of the aspects that are present in *Bryant* which clearly distinguish it from the case *sub judice*. While there are a litany of facts and circumstances occurring in *Bryant* that render the narrow *Lambert* exception as inapposite to the *Bryant* defendant, as this Court correctly decided, no such characteristics arise here. Indeed, the defendant in the instant case is deemed not to have had actual notice about the change in the law or the change in his status under the new law governing his ability to legally possess pseudoephedrine. Nor did the defendant here inform law enforcement authorities about any matters that would demonstrate his awareness about the change in the law or the change in his status under the new law. In summarizing the above delineation of factors quoted in *Bryant* and applying them to the present case, there are no circumstances here which would lead the reasonable individual to know, or even inquire about, a duty to refrain from the possession of pseudoephedrine due to a recent change in the law which turned defendant's heretofore legal possession of the substance into a criminal offense.

Since I would find N.C.G.S. § 90-95(d1)(1)(c) unconstitutional as applied to defendant under these facts and circumstances, consistent with my interpretation of *Lambert*, and the critical distinguishing features of *Bryant*, I respectfully dissent.

Justice BEASLEY joins in this dissenting opinion.